F. M. McClure v. The State.

No. 7374. Decided March 21, 1923.

Rehearing denied June 23, 1923.

**1.—Murder—Principals—Charge of Court—Circumstantial Evidence.**

Where, upon trial of murder, the evidence raised the question of principals, the court properly submitted the law on this subject, applicable to the facts in the case, and there is no reversible error; nor was the charge on circumstantial evidence objectionable because of its reference to the law of principals.

**2.—Same—Evidence—Circumstantial Evidence.**

What was said and done by defendant's companion at his mother's house on the night of the homicide was but the development of links in the chain of circumstantial evidence against the defendant as well as his co-conspirator, and so were the acts and declarations of the co-conspirator made so near after the commission of the offense as to shed light thereon.

**3.—Same—Evidence—Declarations of Defendant.**

The statements of defendant to the officer while under arrest as to his car, and where it would be found and how same came to be in the garage where it was found were admissible under Article 810, C. C. P.

**4.—Same—Evidence—Practice in Trial Court.**

In the absence of some showing that the State was acting in bad faith and had reason to believe and knew that the witness Don McComber would not testify, and was putting him on the stand for the purpose of prejudicing defendant's case, there is no reversible error.

**5.—Same—Argument of Counsel—Witness—Refusal to Testify.**

Every man has a constitutional right to decline to give testimony which would incriminate him, and no inference of guilt should be drawn from his refusal to answer, and certainly none could be drawn as to the guilt of the defendant, and where State's counsel use such argument to convince the jury that the witness being guilty, and having admitted this by his refusal to testify, the defendant who was with him on that night was necessarily guilty, the same was reversible error.

**6.—Same—Defendant's Failure to Testify—Argument of Counsel.**

Where the argument of the State's counsel addressed to the defendant in the second person was a direct comment on the failure of the defendant to testify, because defendant alone had knowledge of the matters asked of him in this argument in the presence of the jury, the same is reversible error.

**7.—Same—Rehearing—Confessions—Statutes Construed.**

The statute relating to confessions is not confined strictly to a technical confession, but covers any act in the nature of a confession, statement or circumstance done or made by defendant while in confinement or custody, and not having been properly warned, which may be used by the State as a criminative fact against him. Following Roberts v. State, 83 Texas Crim. Rep., 139.

**8.—Same—Confession—Discovery of Crime.**

Where the crime was discovered by the defendant's confession, it was properly admitted, if it was not a confession there is no rule of law rendering it inadmissible.

**9.—Same—Conspiracy—Charge of Court—Principals.**

While there was no attempt to fully state the facts in the original opinion, enough of them, however, have been adverted to to support the view expressed therein that the question of a conspiracy to commit murder was one of fact, and in admitting the declaration of the co-conspirator no error was committed.

Appeal from the District Court of El Paso. Tried below before the Honorable W. D. Howe.

Appeal from a conviction of murder; penalty, imprisonment for life in the penitentiary.

The opinion states the case.

*J. M. Harris, Davis, Jackson & Fryer,* for appellant.—On question of Court's charge on principals, Cummins v. State, 219 S. W. Rep., 1104; Black v. State, 145 id., 944; Middleton v. State, 217 id., 1046; Stanchel v. State, 231 id., 121.

On question of defendant's declaration, Dover v. State, 197 S. W. Rep., 192; Clark v. State, 207 id., 98; Hernan v. State, 60 id., 766.

On question of argument of counsel, Stanchel v. State 231 S. W. Rep., 121; Ross v. State, 212 id., 167; Lankford v. State, 222 id., 567; Young v. State, 243 id., 472.

*W. A. Keeling,* Attorney General, *C. L. Stone,* Assistant Attorney General, for the State.

On question of conspiracy, Espalin v. State, 90 Tex. Crim. Rep., 635; Thompson v. State, 90 id., 15.

On question of charge on principals, Monday v. State, 90 id., 8.

LATTIMORE, JUDGE.—Appellant was convicted in the District Court of El Paso County of murder, and his punishment fixed at confinement in the penitentiary for life.

All of the matters and things appearing in this record relate to occurrences taking place in the city of El Paso in El Paso County, Texas. At six o'clock P. M. on March 13, 1922, appellant parted from Miss Julia Isner at her boarding house, telling her that he would see her about 8:30 that night. He was in his Lexington car

at the time. At about 9 o'clock that night one Cornette, a service car driver, testified that he answered a call and went out to Sam's Place at Piedras and Alameda Streets and got appellant and Don McComber there and brought them to the Orndorff hotel down in the business part of the city. Appellant paid him a dollar for the trip. Don McComber's mother testified that she lived on Durazno Street about a block and half from Piedras Street. They had no car but a garage. Mrs. Pollard lived next door. On the night of the homicide Mrs. McComber further stated that something like 8 o'clock her son Roy left the house. Witness thought he came back in half an hour. When he came back he used the telephone which was in her room. She did not know the number he called but he was talking about an automobile, called an automobile out there some where in that part of town, said something about Sam's Place, asked for a car to come out there, that a party wanted to be taken to town. Don then came to witness and asked for a pair of scissors and she told him where to find a pair. She found these scissors later in her bath room. Heard water running in the bath room when Don came and asked her for the scissors. She further testified that there was an outside entrance to her bath room from the back yard where the garage was. Don left home after she gave him the scissors and witness did not think he was absent this time more than half an hour. She further testified that Don was around the garage the next morning and was inside the garage.

About 10 o'clock on the night of the homicide appellant reported to police headquarters that his Lexington car was stolen, that it was taken from in front of his hotel. He told a number of other persons that night and the next morning that said car had been stolen. The room-mate of appellant, who was also his brother-in-law, testified for the State. He said that he did not see appellant from one o'clock on the Monday of the killing, until about 11 o'clock that night when witness went to the room at the hotel occupied by appellant and himself. Appellant was there in his pajamas sitting on the bed. He told witness his car had been stolen between 7:30 and 8:15 P. M. This witness reluctantly admitted that he had sworn on the examining trial of appellant that the latter told him that night to say upon inquiry that he, witness, was in their room between 7:15 and 8:30 and that he saw appellant there. When this witness awoke the next morning appellant had already dressed and gone. Mrs. Jackson swore that she saw appellant at his hotel a little before 10 o'clock on the night of the homicide. He said to her that he had been up in his room all the afternoon and came down to get his car and found some one had stolen it. Mr. Williams testified that he, representing the insurance company that had insurance upon appellant's car, talked to appellant about said car the next morning after the homicide, and that appellant told him that he left his car in front of the Lee

hotel where he lived and went to supper and he knew the car was there at 7:15 and at 8:30; that he was up in his room reading. Witness asked him how he knew it to be there,—if he had seen it. Appellant replied, no, that his brother-in-law, Van Bergen, had come in at 7:15 and the car was there then, and said his brother-in-law had gone out again at 8:30 and it was still there, and that he, appellant, had gone downstairs in the neighborhood of 10 o'clock and the car was gone and that he had reported it to the police. This witness further testified that he asked appellant to write him out a description of the car and was called to the telephone, and when he came back appellant had not written said description, and told witness he was so nervous he could not write and that witness would have to write it himself, which he did. On Thursday or Friday of that same week the Lexington car of appellant was found in the garage at Mrs. McComber's place. Blood, found on analysis to be human blood, was on the back of the front seat, also on the cushion and had run down under the cushion and filled little bolt holes with blood; also that there was some blood on the rear right-hand door and the rear right wheel. This witness said: "You could see some one had tried to wash it off." The officer who found the car said he received the information from which he located it from appellant; that appellant told him he and Don McComber put the car in the garage on Monday night.

Appellant was preparing to leave El Paso and he and his brother-in-law had purchased tickets, one for Cleveland, Ohio, and one for Baltimore, Maryland, and had them in their possession at the time of the homicide. On Friday preceding the homicide on Monday, deceased had drawn a check for $375 on her savings account in a bank in El Paso in favor of appellant and he had cashed it the same day. On Tuesday morning after the homicide appellant told Mr. Lee, his landlord, that he wanted to pay him what he owed and took out of his purse and offered Mr. Lee a $20 bill, the amount due being only a few dollars. Mr. Lee testified that he saw other money, one $50 bill at least, and witness thought three other such bills besides same of other denominations.

It was shown that appellant and Miss Frentzel, deceased, were on terms at least of friendly intimacy and that he frequently took her out in his car, there seeming to be an understanding as to when and where he should meet her to go on such trips. He had never been at her home, neither her father nor mother having ever seen him. Deceased was a stenographer at the Lander Lumber Company. Their telephone was Main 282. Monday afternoon appellant called her there and she replied that she would meet him at the usual place. A witness who heard appellant's end of this conversation said that he fixed the hour of meeting at 7 o'clock. Shortly after this hour Miss Frentzel dressed at her home, putting on a brown suit and an avia-

tor's leather vest to protect her from the wind and also a cape. She left telling her mother that she would be back by 9 o'clock. She never came back alive. At 8:37 or 8:40 her still warm body was found near a street car line in El Paso, how near to her home or to the other places testified about in this record is not shown. She had been shot in the back of the head, the bullet entering just about the hair line, and this bullet which was taken from the wound was said to be a 38-calibre. She had no money on her person when discovered and her wrist watch was gone. Her cape was later found in a wood shed on the McComber place, under a tin such as ordinarily goes under stoves, on top of which tin was a quantity of wood and coal. A little pistol, the property of deceased, was in evidence and identified, and Roy Pollard who lived next to the McComber place testified he first saw this in possession of Don McComber a few days after the homicide, and that Don gave it to him to keep for him. Roy gave it to his mother and she to Mrs. McComber, who threw it in an ash can from which it was later rescued. Appellant had been making efforts to sell his car without success.

Appellant's first complaint is of the submission in the charge of the court of the law of principals. After giving what seems to be a fair definition of principals, the court instructed the jury in substance that if this killing was done by some one other than appellant but he was present and, knowing the unlawful intent of such other person, aided by his acts the person actually committing the homicide, he should be convicted. The converse of this proposition was also stated. This paragraph of the charge was excepted to on the ground that there was no evidence calling for the submission of the law of principals. We regret we cannot agree with learned counsel. The case was one of circumstantial evidence. That the pistol of deceased was in the possession of Don McComber shortly after the homicide, is not disputed. Nor is the further fact that her cape worn by her on that night was found under a pile of fuel in the wood shed where Don lived. The car in which apparently the homicide was committed, was found in the McComber garage. Don McComber left his mother's house about 8 o'clock. He returned somewhere in the neighborhood of half an hour later. The warm bleeding body of Miss Frentzel was found at 8:37 or 8:40 that night. Don McComber came back home and phoned for a car. He got his mother's scissors and went into the bath room. A door led from the bath room into the back yard where the garage was. Appellant told the officer that he and Don put the car on which was found the blood in that garage that night. Without dispute it is shown that appellant and McComber rode together in the service car to town after the hour of the homicide.

The record points only by its circumstances to the guilty participation of one or two parties in the homicide. There is no suggestion of the connection of any other person therewith save McComber and

appellant. We can not agree that a charge submitting the law of principals sets the jury adrift on a sea of speculation. No one having seen the homicide, who gave testimony concerning same, and the facts making it reasonably certain that either appellant alone or McComber alone, or both together, committed this homicide, there was no error in submitting the law of principals. Nor do we think the charge on circumstantial evidence objectionable because of its reference the law of principals.

What was said and done by Don McComber at his mother's house on the night of the homicide, was but the development of links in the chain of circumstantial evidence against this appellant as well as his co-conspirator McComber. The telephoning for the service car which was used by both appellant and McComber in leaving the vicinity of the homicide was unquestionably admissible. McComber was found in possession of the fruits of the crime shortly after. It seems to be the rule in this State that when the acts and declarations of a co-conspirator are made so near after the commission of an offense as to shed light on who are participants therein, they are admissible, and also the fact as to what was said and done by one co-conspirator which appears to be at the dictation and instance of another. Phelps v. State, 15 Texas Crim. Rep., 55; Weathersby v. State, 29 Texas Crim. App. 307; Pace v. State, 20 S. W. Rep. 763; Proctor v. State, 54 Texas Crim. Rep. 260; Eggleston v. State, 59 Texas Crim. Rep., 551; Jones v. State, 85 Texas Crim. Rep., 538.

The statements of appellant to officer while under arrest as to his car and where it would be found and how same came to be in the garage where it was found, seem admissible under Art. 810 of Mr. Vernon's C. C. P., and the authorities there collated, as well as those gathered by Mr. Branch and cited under Sec. 63 of his Annotated P. C. In said statute it is stated that if in connection with a confession there appear statements found to be true which conduce to establish guilt, the confession becomes admissible. That the finding of the bloody car on the premises of Mrs. McComber, leading to the finding of the cape of deceased and her pistol, all conduce to establish guilt seems not debatable.

A bill of exceptions was reserved to the action of the State in putting Don McComber on the stand. This bill does not show whether McComber was then under indictment for participation in this crime or not. He would be a competent witness for the State if he desired to testify. It is made to appear that when the State began to interrogate him as to the facts concerning this homicide that he declined to testify upon the ground that such testimony would incriminate himself. In the absence of some showing that the State was acting in bad faith and had reason to believe or knew that this witness would not testify, and was putting him on the stand for the purpose of prejudicing appellant's case, we could not infer reversible

error from the putting of said witness on the witness stand, even though he declined to testify. However, by his bill of exceptions No. 2 appellant shows that the district attorney in his closing argument to the jury used the following language:

"Don McComber, when he got upon that witness stand, had a right to say 'I refuse to testify because I know nothing.' Did he? No. 'Because I don't know the defendant?' No. No. 'Because I wasn't with him out there when he put the bloody automobile into my garage?' No. No. 'Because I didn't phone for an auto man to come out there and meet a party at Sam's Place?' No. No. But 'I can't testify, I won't because it tends to incriminate me.' Incriminate you in what? What are you guilty of? If it is a lie as Don says that Claude Smith tells about that this man told him that the bloody automobile was placed in the garage about ten o'clock on Monday night—If that is a lie and Don wasn't there, then why incriminate Don."

Every man has a constitutional right to decline to give testimony which would incriminate him, and it is held that if he declines to testify no inference of guilt may be drawn from his refusal to answer. Owen v. State, 7 Texas Crim. App. 334. Certainly if no inference of guilt can be indulged against the man who declines to testify, none could be drawn as to the guilt of a codefendant. Appellant should not in any way be held accountable for the refusal of McComber to give testimony. If the State's purpose in putting this witness on the stand was to compel or invite his refusal to testify in order to use this as an incriminating fact against appellant, the State was guilty of an injustice. Appellant made no objection to the testimony of McComber, and for no reason known to us can he be charged with concealing or withholding such testimony. Any argument which would have the effect of making the jury reach this conclusion was erroneous. The effect of the language used and above set forth in our opinion was necessarily injurious. Here was a most heinous crime, a most dastardly murder, with but two persons seemingly implicated. One of them was put on the stand by the State and in the presence of the jury he declined to testify on the ground that it would incriminate him. He was excused. The State's attorney then in his closing argument brings before the jury that this party could have excused himself on the ground that he did not know anything, but that he did not do this. That he could have excused himself on the ground that he did not know the defendant, but he did not do this? That he could have excused himself on the ground that he wasn't with defendant out there when he put the bloody car in the garage, but he didn't do that? That he could have excused himself on the ground that he hadn't phoned for a service car, but he didn't do that? That his only excuse for not testifying was "because it would incriminate him." Then said district attorney with telling effect

said to the jury "Incriminate you in what? What are you guilty of? If what appellant told Smith about putting the bloody car in the garage is a lie, why incriminate Don." The powerful inference thus drawn from the refusal of McComber to testify, was made a strong weapon to convince the jury that McComber being guilty and having admitted this by his refusal to testify, the other man who was with him on that night was necessarily guilty.

Serious complaint is made of another argument of said State's attorney which was as follows:

"You left the hotel at seven o'clock. Did you see anybody? Did you see anybody? Did you go any place? Tell me, where is the man that you will bring here to testify that he saw your machine or saw you any place on earth after you left the hotel until you bobbed up over at McComber's house? Who is it? Did he go any place? Did he see anybody? Did he talk to anybody? Did he have communication with anybody? Not a soul or that individual would be here testifying. Where was the car? You took it away from the hotel. There was no blood on it then, so far as the evidence shows. If there had been blood at that time, Clarence Van Bergen would have known it probably; Lee would have known it; somebody would have come here to say that before you left that hotel the car was bloody, wouldn't they. Where did you go? What did you do?"

It seems impossible to conclude otherwise than that it was a direct comment on the failure of appellant to testify. It was addressed in the second person, to appellant who alone could have knowledge of the matters asked of him in this argument in the presence of the jury. A comment on the failure of a defendant to testify and an argument that amounts to the same is forbidden by the statute and decisions. Instructions asking that the jury be told not to consider both arguments above referred to were presented and refused, and we think error appears in each instance.

We have examined the other matters complained of herein and do not find in any of them error calling for any discussion or for reversal of this case.

For the errors mentioned the judgment of the trial court is reversed and the cause remanded.

*Reversed and remanded.*

ON REHEARING.

June 23, 1923.

MORROW, Presiding Judge.—In his motion for rehearing, appellant seeks a modification of the former opinion.

Counsel insists that the declaration of the appellant not a confession within the meaning of Art. 810, C. C. P., and therefore was not admissible, although it resulted in the discovery of the car in which the homicide took place, as well as the blood of the deceased and the

weapons used. Mr. Branch, in Section 59 of his Ann. Tex. P. C., defines a confession thus:

"The Statute relating to confessions is not confined strictly to a technical confession, but covers any act in the nature of a confession, statement or circumstance done or made by defendant while in confinement or custody, and not having been properly warned, which may be used by the State as a criminative fact against him."

Many cases are collated from which the correctness of this definition is deduced. Many others are found collated in Vernon's Crim. Stat., Vol. 2, Sup. 1922, p. 2592. Among these are Carter v. State, 23 Texas Crim. App. 508; Roberts v. State, 83 Texas Crim. Rep. 139; Kyle v. State, 86 Texas Crim. Rep. 471; Willoughby v. State, 87 Texas Crim. Rep. 40; Bloch v. State, 81 Texas Crim. Rep. 1; Dover v. State, 81 Texas Crim. Rep. 553. Willoughby's case, supra, which characterizes the evidence as a confession is not distinguishable from the present one. Willoughby declared that certain suit-cases which had been found by the officers belonged to him. He was under arrest, and the admission of this against him was held error for the reason that it was a confession and the suit-cases had been previously discovered. In the instant case, appellant told the officers where the automobile was situated. It had not previously been found and its locality was unknown. It was discovered through his confession. It may be added, however, that his declaration was an admission against his interest, and if it was not a confession within the provisions of Article 810, C. C. P., no reason for excluding it is perceived. In other words, if it was a *confession*, it became admissible by reason of its leading to the discovery and identification of the automobile in which the deceased was killed; if not a *confession*, there is no rule of law rendering it inadmissible.

Another question presented in the motion is that the evidence did not warrant a charge on principals; that there was no evidence of a conspiracy to commit murder, but that the evidence of a conspiracy, if any, pointed to an intent to commit a crime, growing out of the collecting of an insurance policy upon the pretense that appellant's automobile was missing. It may be that the evidence was such as might have rendered it appropriate that the jury be told to determine whether there was a conspiracy and whether it related to the murder or simply to the fraudulent acquisition of money, and if to the latter alone, the declaration of the alleged co-conspirator could not be used to show appellant's guilt of murder.

No attempt was made to fully state the facts in the original opinion. Enough of them, however, have been adverted to support the view expressed therein that the question of a conspiracy to commit murder being one of fact, and in admitting the declaration of the co-conspirator, as mentioned in the original hearing, no error was committed.

The motion is overruled.

*Overruled.*